# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAWN G. BRADSHAW, | Case No. 1:16-cv-01568-AWI-SAB-HC |
| Petitioner, | FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| W.L. MONTGOMERY, | |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## I.

## BACKGROUND

On June 20, 2013, Petitioner was convicted after a jury trial in the Kings County Superior Court of attempted murder and two counts of robbery. The jury also found true multiple firearm enhancements. (CT[1] 95–97). On September 5, 2013, Petitioner was sentenced to a total imprisonment term of sixty years and four months. (CT 174). On April 28, 2015, the California Court of Appeal, Fifth Appellate District affirmed the judgment. People v. Bradshaw, No. F068007, 2015 WL 1917208, at *22 (Cal. Ct. App. Apr. 28, 2015). The California Supreme Court denied Petitioner's petition for review on July 8, 2015. (LDs[2] 11, 12).

---

[1] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent on February 6, 2017. (ECF No. 15).
[2] "LD" refers to the documents lodged by Respondent on February 6, 2017. (ECF No. 15).

On October 13, 2016, Petitioner filed the instant federal petition for writ of habeas corpus in the Sacramento Division of the United States District Court for the Eastern District of California. (ECF No. 1). On October 17, 2016, the petition was transferred to the Fresno Division. (ECF N. 4). In the petition, Petitioner raises the following claims for relief: (1) insufficient evidence to sustain an attempted murder conviction; (2) ineffective assistance of counsel; and (3) instructional error. Respondent has filed an answer. (ECF No. 14).

## II.

## STATEMENT OF FACTS[3]

Mellie's Market is a liquor store on Sixth Avenue in Kingsburg. There are two structures behind the store: A building with a kitchen and bathroom, and a separate structure where Jorge Morales lived. A small patio was between the store and the rear structures.

At the time of the robbery, Morales had been involved in a relationship with Garcia for a few weeks. Morales knew her as "Angelica." Morales frequently gave her money to help her. Morales testified he loaned Garcia about $500 so she could return to her family in Texas. Garcia promised to repay the loan after she returned to Texas.

Morales testified Garcia asked for more money because she claimed she was pregnant and Morales was the father. Morales believed she was lying. About a week before the robbery, Garcia introduced Morales to Jacob Herrera, and said Herrera was her "brother." Garcia asked Morales for $50 to give to her "brother."

### *Garcia, Herrera and Defendant*
Garcia testified Morales gave her $200 for a plane ticket to Texas. He also gave her money for other things when she asked for it, and Garcia thought he was very generous. However, Garcia testified she wanted even more money from him. She falsely claimed she was pregnant and needed more money. Morales refused.[4]

Garcia testified Herrera was her cousin. Garcia told Herrera that Morales gave her money whenever she asked for it. Herrera urged her to get more money from Morales if she could do it. They had a couple of conversations when Herrera told her to get whatever she could out of Morales.

Garcia testified that on July 30, 2012, she got into Herrera's maroon truck because they were going to Morales's house. Herrera's girlfriend and another girl were in the truck. Herrera was driving, and he stopped to pick up defendant. Garcia knew defendant was Herrera's friend and had met him before.

---

[3] The Court relies on the California Court of Appeal's April 28, 2015 opinion for this summary of the facts of the crime. <u>See</u> <u>Vasquez v. Kirkland</u>, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).

[4] Garcia testified for the prosecution while in custody after entering a plea for her participation in the robbery of Morales and Perez. She was sentenced to three years. She was a reluctant witness and was ordered to testify. Garcia admitted that when she initially gave a statement in this case, she falsely claimed she had been forced to participate in the robbery. Garcia testified she was not forced to do anything that day.

Garcia testified that the original plan was that she was going to ask Morales for more money rather than rob him. However, Garcia also testified that when she got into Herrera's truck, she knew they were going to rob Morales. "I mean when you go—how do I explain it. When you go to rob somebody, I mean, you have an idea of what's going to happen. You just already know." "I knew we were going to rob him. Well, I was going to ask for it. If he didn't give it to me, we were going to take it."

Garcia testified defendant had a gun when he got into the truck. As Herrera drove to the market, Garcia testified they talked about the "situation," and she said that she would rob Morales. Garcia was ready to do it on her own. Instead, Herrera told her to knock on the door and they would take care of it.

Garcia was concerned about defendant's gun and told the others that she did not want anything stupid to happen or things to get out of hand: "I didn't want nobody to die or nothing." Herrera told her: "'We already know, cuz, just chill.'" Garcia was under the influence of methamphetamine that night.

During the drive, Herrera told Garcia to call Morales. Garcia called and Morales said he was taking a shower. Garcia told Morales she was going to visit him, and he said that was okay and they could talk.

### The Patio

On the evening of July 30, 2012, Lindsay Constant (Constant) and her husband arrived at Mellie's Market with their friend, Kenneth Mullins. They sat in the patio area and visited with Morales and his friend, Perez. Constant had soft drinks while the men drank beer.

Sometime around 9:00 p.m., Morales left the patio, went into the rear building, and took a shower. Perez borrowed Morales's cell phone and went to the adjacent garden to call his family. Constant and her companions remained on the patio.

### Garcia and Herrera Arrive on the Patio

Garcia testified that when they arrived at the market, Herrera parked on the side of the building. There were two other cars there. Garcia got out of the truck and headed to the house. Herrera and the others initially stayed with the truck. Herrera raised the hood on his truck and pretended something was wrong with the engine.

Constant testified that she was still sitting on the patio with her husband and Mullins when Garcia arrived. Garcia asked for Morales. Constant said Morales was in the house. Garcia went into the house, and Constant never saw her again. However, Constant heard Garcia ask Morales if she could borrow his cell phone.

Garcia testified she went inside the house and entered the bathroom. She briefly spoke to Morales, who was still in the shower, and asked if he was almost done. Morales said yes, and Garcia left the bathroom. Morales heard Garcia leave through the door, and he never saw Garcia again that night.

Constant testified that about two minutes after Garcia went into the house, Herrera arrived on the patio. He was talking on his cell phone. Constant's husband said: "What's up, man. [Morales] is inside." Herrera remained on the cell phone and walked into the house.

Garcia testified that after she left the bathroom, she went into Morales's bedroom. She put down her cell phone and looked around for his wallet. Garcia heard "a

ruckus" outside. Herrera entered the room, told her to leave, and said they "got it." Garcia walked out and mistakenly left her cell phone in Morales's bedroom.

### Defendant Arrives on the Patio

Constant testified that a few minutes after Herrera went into the house, he returned outside and walked out of the patio gate. Shortly afterward, however, Herrera walked back to the patio, and defendant was with him.[5]

Constant testified that when defendant arrived, he immediately started to grab at his waist "like he had a gun in his waistband," but Constant never saw a weapon. Defendant told Herrera: "'What the f**k? You never said anything about these people being here,'" referring to Constant and her companions. Herrera told defendant not to worry about them, "'They're cool, let's just go.'" Defendant and Herrera walked into the house.

### Constant and Her Companions Leave

After defendant and Herrera went into the house, Constant heard the two men bang on the bathroom door and tell Morales to come outside. Constant heard the sound of the shower but did not hear Morales make any reply. Constant became afraid and told her husband they should leave. Constant, her husband, and Mullins left the patio and walked to their cars, which were parked in front of the store.

Constant testified defendant and Herrera walked out of the house toward a burgundy truck parked near the store. Garcia was not walking with them. Constant thought there were three more people in the truck. Defendant and Herrera said their truck's battery had died, and asked Mullins for a jump start. Mullins drove his car up to their truck, but no one had jumper cables. Mullins drove away in his car, and Constant and her husband left in their own car.

Constant testified they left about 10 to 15 minutes after Garcia, defendant, and Herrera had arrived. Constant never saw a gun or heard any gunshots while they were there. Defendant and Herrera were standing by the truck when Constant drove away.

### Robbery of Perez (Count II)

In the meantime, Perez was still standing outside the building, using Morales's cell phone and talking to his family. Defendant and Herrera approached him. They asked Perez where Morales was. Defendant and Herrera went into the house, and Perez continued with his cell phone conversation.

Perez testified the men suddenly returned outside. Herrera hit Perez in the ear and knocked him down. Perez dropped Morales's cell phone and fell to the ground. Both men got on top of Perez. Herrera put a knife to his chest. Defendant pulled a gun from his waist and placed it against Perez's chest. One of the men told Perez to "'give me everything.'" The two men took Perez's wallet, which contained $120 in cash, a check for $430, his bank cards, and his identification.[6] They picked up Morales's cell phone from the ground, and took two other cell phones from Perez's pockets.

---

[5] Constant did not know defendant or Herrera. During the investigation, she identified them as the two suspects from photographic lineups.

[6] Perez testified he subsequently determined that someone used his bank cards to withdraw $400 from his accounts, but the bank returned the money to him.

Perez testified the men told him not to get up or move or they would shoot him. "They said if you move we will shoot you." The two men went back into the house, and one man stood near the door.

### *Robbery of Morales (Count III)*

Morales testified that after he briefly spoke to Garcia, he got out of the shower, got partially dressed, and walked out the bathroom holding the rest of his clothes. Morales discovered Herrera and an African-American man were waiting for him. Morales recognized Herrera as Garcia's "brother," but he did not know the second man. Defendant was subsequently identified as the second man.[7]

Morales testified Herrera pulled a folding knife with a six-to-eight inch blade, and pointed it at his chest. Defendant had a gun, which appeared to be a nine-millimeter semiautomatic weapon. Defendant placed the muzzle on Morales's forehead. Defendant told him not to move and took his wallet, which contained $700. Herrera hit Morales in the face.

### *Attempted Murder of Perez (Count I)*

As Morales was being robbed, Perez was still lying on the ground in the garden area. He decided to escape. He got up and started to run toward a neighbor's house.

When he had run about 25 to 30 meters, Perez heard one gunshot fired, but he was not hit. Perez believed the shot was fired at him because "I was the one who ran that way and there was no one else." Perez did not see who fired the shot, but he knew that defendant had the gun.

Morales testified defendant and Herrera went outside after they robbed him. Morales saw defendant fire one shot at Perez as he tried to run away. "I was there in front when [defendant] fired at [Perez]." Morales testified he actually saw defendant fire the gun. Morales believed defendant was firing at Perez because Perez was trying to run away, and defendant "pointed it towards where [Perez] was running."

Garcia testified that when she left Morales's house, she saw Perez lying on the ground. She went to Herrera's truck. A few minutes later, she headed back to the house and saw Morales walk out with Herrera. Herrera hit Morales, and he fell to his knees. Herrera told her to get out of there. She heard two gunshots and ran back to the truck. She could not see defendant when she heard the gunshots.

Morales testified that when he heard the gunshots, he took two steps toward Perez to find out if he was okay. Defendant told him not to move, and Morales stopped. Defendant reached down where he was standing, and Morales believed defendant was trying to pick up a casing from the ground. Defendant and Herrera ran toward their truck and quickly drove away.

### *After the Robbery*

Garcia testified defendant and Herrera got into the truck, and Herrera sped away and the tires were squealing. Defendant and Herrera passed the gun back and forth, and Herrera's girlfriend placed the gun in the truck's center console. Garcia testified she was "a little shaken up" from the incident, but "[i]t wore off after a minute" and "everything was cool."

---

[7] It was stipulated that Morales was shown two photographic lineups, defendant's photograph was in one of the lineups, Morales identified two different people as the gunman, and he did not select defendant. However, Garcia testified the two men who confronted Morales were Herrera and defendant.

While they were driving away, Garcia realized she left her cell phone in Morales's room. Herrera said she was "a dumb ass." Defendant said to forget about it since the incident was over. Instead, everyone discussed how much they got and how they were going to split it. Defendant had Morales's wallet and removed the cash. Defendant had the credit cards and cell phones. Herrera and defendant each gave $100 to Garcia as her share. Garcia gave her share back to Herrera so he could purchase methamphetamine for her. Herrera gave a credit card to one of the girls who had been in the truck, and told her to put some money on her boyfriend's "books" in jail.

### *The Investigation*

Brent Lunde lived near the market. He heard two or three gunshots followed by chaotic yelling. He saw "the shadows" of three people run toward a car, which took off from the area. Lunde called the sheriff's department.[8]

After the suspects left, Morales went into the house and discovered his personal property had been removed from his backpack and scattered. His identification papers were missing. He also discovered that someone left behind a red cell phone.

The officers did not find any bullet casings at the scene. Morales gave them the cell phone which he found in his room. The cell phone contained photographs of Herrera and Garcia. A photographic lineup was prepared which included Herrera's photograph. Morales identified Herrera as one of the robbers.

On September 26, 2012, Herrera was arrested on an outstanding warrant. He was advised of his rights and interviewed about the robbery of Morales. As a result of the interview, defendant became a suspect. Lindsay Constant identified both defendant and Herrera from separate photographic lineups. Constant clarified that defendant was the man who grabbed at his belt when he arrived on the patio. Garcia was arrested in Texas and confirmed the identifications of defendant and Herrera. She further confirmed that defendant had the gun in the truck. Morales looked at photographic lineups with defendant's picture and identified someone else as the second suspect.

Saranise Johnson was one of the people in the truck with Garcia, defendant, Herrera, and Herrera's girlfriend. Johnson testified they went to visit Garcia's boyfriend, she never heard anyone talk about a robbery, and she never saw a gun. When they arrived at the market, she stayed in the car with Herrera's girlfriend. Garcia got out first, and Herrera and defendant followed her. Johnson testified she heard a loud noise like a door being slammed, and she was "not sure if it was a gunshot or not." She did not know what happened at the market. Garcia, Herrera, and defendant ran back to the truck, they were excited, and Herrera quickly drove away. Herrera gave her a credit card, however, and she used it to put money on her boyfriend's jail account.[9]

Bradshaw, 2015 WL 1917208, at *1–5 (footnotes in original).

---

[8] In his opening brief, defendant states that that defendant, Herrera, Garcia and the others sped away in the red truck just after Mullins had offered to give them a jump start. However, the entirety of the record suggests that the exchange about jump-starting Herrera's truck occurred before the robberies and attempted murder. Constant testified she never heard any gunshots and defendant and Herrera were still standing by the red truck when she drove away; and Brent Lunde testified that he heard the gunshots, saw three people run to a vehicle, and then the vehicle sped away.

[9] Johnson had prior misdemeanor convictions for giving a false identification and theft of checks, and was facing charges for using the stolen credit card in this case.

# III.

## STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged convictions arise out of the Kings County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Lockyer v. Andrade, 538 U.S. 63, 70–71 (2003); Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id. In addition,

the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA. <u>Moses v. Payne</u>, 555 F.3d 742, 754 (9th Cir. 2009) (quoting <u>Wright v. Van Patten</u>, 552 U.S. 120, 125 (2008)); <u>Panetti v. Quarterman</u>, 551 U.S. 930 (2007); <u>Carey v. Musladin</u>, 549 U.S. 70 (2006). If no clearly established Federal law exists, the inquiry is at an end and the Court must defer to the state court's decision. <u>Musladin</u>, 549 U.S. 70; <u>Wright</u>, 552 U.S. at 126; <u>Moses</u>, 555 F.3d at 760.

If the Court determines there is governing clearly established Federal law, the Court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." <u>Lockyer</u>, 538 U.S. at 72 (quoting 28 U.S.C. § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." <u>Williams</u>, 529 U.S. at 412–13; <u>see also</u> <u>Lockyer</u>, 538 U.S. at 72. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" <u>Williams</u>, 529 U.S. at 405 (quoting Webster's Third New International Dictionary 495 (1976)). "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." <u>Id.</u> If the state court decision is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed under the pre-AEDPA de novo standard. <u>Frantz v. Hazey</u>, 533 F.3d 724, 735 (9th Cir. 2008) (en banc).

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u>, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." <u>Id.</u> at 411; <u>see also</u> <u>Lockyer</u>,

538 U.S. at 75–76. The writ may issue only "where there is no possibility fair minded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Richter, 562 U.S. at 102. In other words, so long as fair minded jurists could disagree on the correctness of the state court's decision, the decision cannot be considered unreasonable. Id. If the Court determines that the state court decision is objectively unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious effect on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99–100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98. This court "must determine what arguments or theories ... could have supported, the state court's decision; and

1 then it must ask whether it is possible fairminded jurists could disagree that those arguments or

2 theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 102.

### IV.

### REVIEW OF CLAIMS

#### A. Sufficiency of Evidence

In his first claim for relief, Petitioner asserts that there was insufficient evidence to

sustain an attempted murder conviction because the prosecution did not prove that he had the

specific intent to kill. (ECF No. 1 at 4).[10]  Respondent contends that this claim is unexhausted.

(ECF No. 14 at 23). This claim was presented on direct appeal to the California Court of Appeal,

Fifth Appellate District, which denied the claim in a reasoned decision. However, this claim was

not fairly presented to the California Supreme Court in the petition for review, and thus,

implicates exhaustion concerns.[11] However, pursuant to 28 U.S.C. § 2254(b)(2), the Court may

deny an unexhausted claim on the merits "when it is perfectly clear that the [petitioner] does not

raise even a colorable federal claim." Cassett v. Stewart, 406 F.3d 614, 624 (9th Cir. 2005)

(adopting the standard set forth in Granberry v. Greer, 481 U.S. 129, 135 (1987)).

The United States Supreme Court has held that when reviewing a sufficiency of the

evidence claim, a court must determine whether, viewing the evidence and the inferences to be

drawn from it in the light most favorable to the prosecution, any rational trier of fact could find

the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S.

307, 319 (1979). A reviewing court "faced with a record of historical facts that supports

conflicting inferences must presume—even if it does not affirmatively appear in the record—that

the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that

resolution." Id. at 326. State law provides "for 'the substantive elements of the criminal offense,'

but the minimum amount of evidence that the Due Process Clause requires to prove the offense

---

[10] Page numbers refer to ECF page numbers stamped at the top of the page.

[11] A petitioner in state custody who is proceeding with a petition for writ of habeas corpus generally must exhaust state judicial remedies. 28 U.S.C. § 2254(b)(1). The exhaustion doctrine is based on comity to the state court and gives the state court the initial opportunity to correct the state's alleged constitutional deprivations. Coleman v. Thompson, 501 U.S. 722, 731 (1991); Rose v. Lundy, 455 U.S. 509, 518 (1982). If Petitioner has not sought relief in the California Supreme Court for the claims that he raises in the instant petition, the Court cannot proceed to the merits of those claims. 28 U.S.C. § 2254(b)(1); O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).

is purely a matter of federal law." Coleman v. Johnson, 566 U.S. 650, 655 (2012) (quoting Jackson, 443 U.S. at 319).

Under California law, "[a]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. Attempted murder requires express malice, that is, the assailant either desires the victim's death, or knows to a substantial certainty that the victim's death will occur." People v. Booker, 51 Cal. 4th 141, 177–78 (Cal. 2011) (citations omitted). The California Supreme Court has held that "[t]he act of shooting a firearm toward a victim at close range in a manner that could have inflicted a mortal wound had the shot been on target is sufficient to support an inference of an intent to kill." People v. Houston, 54 Cal. 4th 1186, 1218 (Cal. 2012) (citing People v. Smith, 37 Cal. 4th 733, 741 (Cal. 2005)). This determination is binding on this Court. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.").

Viewing the record in the light most favorable to the prosecution and presuming all conflicts were resolved in favor of the prosecution, the Court finds that a rational trier of fact could have found true beyond a reasonable doubt that Petitioner acted with a specific intent to kill. There was evidence that Petitioner fired a gun at Perez in a manner that could have inflicted a mortal wound. Perez testified at trial that after Herrera and Petitioner had taken Perez's wallet and cell phones and turned their attention to Morales, Perez started running away. (4 RT[12] 389–90). When Perez had run approximately twenty-five to thirty meters, he heard one gunshot fired. Perez did not see who shot the gun, but knew that Petitioner had the gun when Perez was being robbed. Perez believed that the shot was fired at him because he "was the one who ran that way and there was no one else." (4 RT 390, 394). Morales testified that after Petitioner had taken Morales's wallet, Petitioner fired his gun at Perez. (4 RT 320). Morales testified that Petitioner pointed his gun toward where Perez was running and that there was no one else around Perez. (4 RT 321).

---

[12] "RT" refers to the Reporter's Transcript on Appeal lodged by Respondent on February 6, 2017. (ECF No. 15).

As the Supreme Court has stated,

> Jackson . . . makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury.

Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam) (quoting Renico v. Lett, 559 U.S. 766, 773 (2010)). Under this deferential standard of judicial review, the Court finds that a rational trier of fact could find that Petitioner had the specific intent to kill. As it is "perfectly clear" that Petitioner does not raise a colorable sufficiency of the evidence claim with respect to his specific intent to kill, the Court may deny this claim on the merits pursuant to 28 U.S.C. § 2254(b)(2).

## B. Ineffective Assistance of Counsel

In his second claim for relief, Petitioner asserts that his trial counsel was ineffective for failing to "seek a sentence that would best serve Petitioner in light of numerous enhancements that were illegally imposed." (ECF No. 1 at 4). Respondent argues that the state court's denial of this claim was reasonable and did not offend any Supreme Court precedent. (ECF No. 14 at 28). This claim was raised on direct appeal to the California Court of Appeal, which denied the claim in a reasoned decision. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying Petitioner's ineffective assistance of counsel claim, the California Court of Appeal stated:

> **IV.** *The Alleged Stipulation at the Sentencing Hearing*
> Defendant contends his attorney was prejudicially ineffective at the sentencing hearing because he failed to accept a stipulation purportedly offered by the prosecutor, to strike the section 12022.53, subdivision (c) enhancement for the personal and intentional discharge of the firearm in the commission of the robberies. Defendant asserts that counsel's failure to accept the offered stipulation was prejudicial because it would have resulted in a lesser sentence. As we will explain, the record of the sentencing hearing refutes defendant's characterization of this alleged stipulation.[13]

_____

[13] We will fully review the court's findings at the sentencing hearing since they are relevant to additional issues raised in this appeal.

## A. *The Court's Tentative Findings*

As to all counts, the jury found true the section 12022.53, subdivision (c) enhancement, that defendant personally and intentionally discharged a firearm in the commission of the attempted murder of Perez, the robbery of Perez, and the robbery of Morales. Section 12022.53, subdivision (c) states that upon finding that enhancement true, the court "shall" impose an additional and consecutive term of 20 years.

When the court convened the scheduled sentencing hearing, it advised the parties that it intended to impose the upper term for count I, attempted murder of Perez, with a consecutive term of 20 years for the section 12022.53, subdivision (c) enhancement for defendant's discharge of the firearm. However, the court was concerned about whether that same enhancement could be imposed for both robbery convictions. "The Court believes that the facts are such that they can be argued both ways that it is either a continuing course of conduct, the robbery through the shooting, or whether the facts appear to this Court to be a distinct and separate violation. If it's ... a distinct and separate violation then, again, it should run consecutive in this matter because it's a separate crime."

The court was also concerned whether the jury's finding that defendant personally and intentionally "discharged" a firearm in the commission of the two robberies was correct. The court thought that the section 12022.53, subdivision (b) "use" enhancement might have been more appropriate for both robberies since only one shot was fired.[14] The court asked the parties what the appropriate remedy would be in such a situation, whether it could modify the subdivision (c) "discharge" enhancement to a subdivision (b) "use" finding, or whether the modification of the jury's finding would implicate *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*).

The prosecutor replied the court could impose consecutive firearm enhancements for both counts II and III because defendant discharged the firearm in the commission of both robberies: he robbed Perez, warned him to stay down or he would be shot, moved on to Morales, and "[a]t that point, while committing the [robbery] on [Morales], the defendant then saw [Perez] get up and move. At that point there's a [robbery] continuing to happen on the second [victim]," and then the attempted murder occurred.

The prosecutor was concerned about the court's possible dismissal of the firearm enhancement, and further stated:

> "I would be willing to stipulate with the defense, if the defense wants to stipulate to that, that that should be [section] 12022.53(b) despite the—the jury's finding, because I believe [subdivision] (b) would be inclusive in the subdivision (c). I don't agree with the Court that it's [section] 654. So if the defense wants to stipulate that that should be in the [subdivision] (b) section and it should be one-third of the 10 years instead of the 20 years, that I would be in agreement with. If there is not an agreement as to that, then I think we need to brief the issue."

The prosecutor argued a stipulation would not violate *Apprendi* or prejudice the defense. The court replied that defendant would suffer prejudice if he prematurely accepted such a stipulation. The court explained that if the wrong enhancement

---

[14] Section 12022.53, subdivision (b) provides for a 10–year enhancement if the defendant "personally uses a firearm" in the commission of the offense.

was alleged, and it lacked legal authority to modify the jury's finding, then it would have to strike the entire enhancement instead of imposing a lesser term.

Defense counsel said he might be willing to stipulate after he talked to defendant, but "I do think it needs to be briefed really because of the ramifications here" and asked for further time.

The court set a briefing schedule and asked the parties to address whether section 12022.53, subdivisions (b) or (c) were the appropriate enhancements for counts II and III, the robberies of Perez and Morales, and the appropriate remedy if the jury's finding on the subdivision (c) enhancement was incorrect.

### B. *The Sentencing Hearing*

The prosecution submitted a sentencing brief and argued the court could impose the section 12022.53, subdivision (c) enhancements as to both counts II and III. Defense counsel did not submit a brief.

At the continued sentencing hearing, the court made lengthy findings that there were multiple aggravating circumstances and no mitigating circumstances, and indicated its proposed sentence. As to count I, attempted murder of Perez, the court intended to impose the upper term of nine years, doubled to 18 years as the second strike sentence, plus consecutive terms of 20 years for the section 12022.53, subdivision (c) firearm enhancement, and five years for the prior serious felony enhancement.

As to count II, the robbery of Perez, the court intended to impose consecutive sentences and found section 654 did not apply. The court found the offense was a separate act of violence and "there was a distinct delay between the robbery and the shooting of the gun at the victim as he fled, which to me shows a separate criminal intent in addition to it being ... a separate act of violence against the victim." The court intended to impose one year for count II (representing one-third the midterm) doubled to two years as the second strike sentence.

The court also addressed its previous concerns about the firearm enhancements. The court found section 12022.53, subdivision (c) was the correct enhancement for the robbery convictions, and that multiple firearm enhancements could be imposed for multiple offense against several victims even if a single shot was fired, based on *In re Tameka C.* (2000) 22 Cal.4th 190 (*Tameka C.*). The court found that when defendant fired the shot, he "facilitated both the initial robbery, the attempted murder and the robbery of the second victim all at one time." The court intended to impose one-third of the 20–year firearm enhancement for count II, which was eight years eight months.

The court stated the same analysis applied for count III, the robbery of Morales, and it would impose two years for the robbery (double of one-third the midterm) plus eight years eight months for the firearm enhancement (one-third the 20–year enhancement).

The court asked the parties for argument. The prosecutor concurred with the tentative ruling. Defense counsel said: "My client wants me to submit it on your tentative, your Honor, that's fine."

The court adopted its tentative ruling and sentenced defendant to an aggregate term of 60 years four months.

### C. *Analysis*

Defendant contends his defense counsel was prejudicially ineffective for failing to immediately agree to the prosecutor's proposed stipulation at the initial sentencing hearing, to reduce the firearm enhancement to a finding under section 12022.53, subdivision (b), because he would have received a lesser term. Defendant also complains his attorney failed to file supplemental briefing on the matter or raise the proposed stipulation at the continued sentencing hearing. Defendant asserts counsel's failure was prejudicial because he would have received a lesser sentence.

Defendant's argument is based upon a false premise. Generally, the court has the discretion whether to accept or reject stipulations. (See e.g., *People v. Hall* (1980) 28 Cal.3d 143, 152–153, overruled on other grounds in *People v. Newman* (1999) 21 Cal.4th 413, 422, fn. 2, abrogated by constitutional provision on other grounds as stated in *People v. Valentine* (1986) 42 Cal.3d 170, 177–182; *People v. Bonin* (1989) 47 Cal.3d 808, 848–849; *People v. Edelbacher* (1989) 47 Cal.3d 983, 1007.) However, "a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it...." (*Old Chief v. United States* (1997) 519 U.S. 172, 186–187.)

In this case, the People pleaded and proved that defendant personally and intentionally discharged a firearm in the commission of the offenses within the meaning of section 12022.53, subdivision (c). The court's questions were whether that was the correct subdivision, and whether multiple enhancements could be imposed, since defendant only fired one shot. In raising this question, the court was also concerned whether it had the discretion to modify the jury's findings to a lesser enhancement, if a modification implicated the jury's findings under *Apprendi,* or the enhancement must be stricken as to one or both robbery convictions. In an attempt to avoid the complete elimination of the enhancement, the prosecutor quickly offered to stipulate to the court's ability to modify the jury's finding, and argued a stipulation would avoid any *Apprendi* error and not be prejudicial to defendant. The court disagreed about the potential prejudice since the entire enhancement might have to be stricken.

More importantly, however, the court correctly concluded that it could impose multiple section 12022.53, subdivision (c) enhancements for defendant's discharge of the firearm based on the firing of a single shot. The sentencing scheme set forth in section 12022.53 is "unfettered by section 654" and does not prevent imposition of multiple enhancements for the discharge of a firearm on counts involving multiple victims but a single act. (*People v. Frausto* (2009) 180 Cal.App.4th 890, 898 & fn. 4.) "[S]ection 12022.53 calls for multiple enhancements to be imposed when there are several victims but only one injury. [Citation.]" (*Id.* at p. 899; *People v. Oates* (2004) 32 Cal.4th 1048, 1054–1055.)

At the sentencing hearing, the court cited *Tameka C., supra,* 22 Cal.4th 190 when it decided it could impose the firearm enhancements. In *Tameka C.*, the minor shot her intended victim and then fired gunshots in the direction of three police officers. She missed the officers, but shattered the glass in a door of a nearby hotel, and a shard of glass struck a child inside the building. The minor may not have known the child was present. The juvenile court found the minor committed assault with a firearm against the child and the three officers. The minor challenged the imposition of separate firearm enhancements for each count. (*Id.* at pp. 192, 197.) *Tameka C.* held the enhancements were properly imposed: "The Legislature has expressed its purpose of deterring unlawful firearm use and avoiding the ensuing injury to the public, and we have recognized that the number

of victims exposed to the use of a firearm is relevant to the defendant's culpability. [Citations.] We therefore reject defendant's contention that section 12022.5, subdivision (a), should be interpreted to provide that even if a single shot facilitates the commission of more than one felony, only one firearm-use enhancement may be imposed. Instead, we conclude that [minor] used a firearm in the commission of each of the multiple assaults upon the three officers and [the child], even though such use occurred on a single occasion and apparently involved a single act." (*Id.* at pp. 199–200.)

In this case, even if defense counsel had immediately agreed to the prosecutor's proposed stipulation, it is clear the court was not going to accept it without further consideration of the matter. At the continued sentencing hearing, the court made extensive findings and correctly concluded that multiple firearm enhancements were appropriate based on *Tameka C., supra,* 22 Cal.4th 190. Defense counsel's failure to accept the stipulation, file further briefing, and raise the matter at the sentencing hearing were not prejudicial given the applicable law, and the court's obvious disinclination to accept the stipulation without determining the legally correct sentence in this case. A trial counsel is not required to undertake futile acts or file meritless motions simply to withstand later claims of ineffective assistance. (*People v. Anderson, supra,* 25 Cal.4th 543, 587.)

Bradshaw, 2015 WL 1917208, at *12–15 (footnotes in original).

The clearly established federal law governing ineffective assistance of counsel claims is Strickland v. Washington, 466 U.S. 668 (1984). In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors. Strickland, 466 U.S. at 687. First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Id. at 687. The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Richter, 562 U.S. at 105 ("The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom.") (citing Strickland, 466 U.S. at 690). Judicial scrutiny of counsel's performance is highly deferential. A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 687. A reviewing court should make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at that time." Id. at 689.

Second, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Strickland, 466 U.S. at 693. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. A court "asks whether it is 'reasonable likely' the result would have been different. . . . The likelihood of a different result must be substantial, not just conceivable." Richter, 562 U.S. at 111–12 (citing Strickland, 466 U.S. at 696, 693). A reviewing court may review the prejudice prong first. See Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002).

Here, the California Court of Appeal found that the trial court correctly determined that it could impose multiple section 12022.53(c) enhancements for Petitioner's discharge of the firearm based on the firing of a single shot. Bradshaw, 2015 WL 1917208, at *14. This determination is binding on this Court. See Bradshaw, 546 U.S. at 76 ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). As the enhancements were proper under state law, "trial counsel cannot have been ineffective for failing to raise a meritless objection." Juan H. v. Allen, 408 F.3d 1262, 1273 (9th Cir. 2005).

Based on the foregoing, the Court finds that the state court's denial of Petitioner's ineffective assistance of counsel claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his second claim, and it should be denied.

## C.  Instructional Error

In his third claim for relief, Petitioner asserts that the trial court failed to properly instruct the jury regarding accomplice testimony. Specifically, Petitioner contends that the trial court failed to instruct the jury to consider that the accomplice signed a plea deal and to treat the accomplice's testimony with caution. (ECF No. 1 at 5). Respondent argues that the claim is

procedurally barred, but in any event, the state court's denial of this claim was reasonable. (ECF No. 14 at 37).

On direct appeal, Petitioner raised an instructional error claim regarding CALCRIM No. 335. (LDs 7, 11). CALCRIM No. 335 instructed in pertinent part, "If the crimes of robbery, as set forth in Counts 2 and 3 of the Information were committed, then Jessica Garcia was an accomplice to those crimes. You may not convict the defendant of those crimes based on the testimony of an accomplice alone." (CT 130). Petitioner argued that he was unfairly prejudiced because instructing that Garcia was an accomplice to the robbery might be construed by the jury as imputing Garcia's admitted guilt to Petitioner. (LD 7 at 27; LD 11 at 12). The California Court of Appeal found that Petitioner "forfeited any claim of error because he failed to object to CALCRIM No. 335 or request any clarifying language." Bradshaw, 2015 WL 1917208, at *11. In the alternative, the court found that that "[t]he jury was properly instructed with CALCRIM No. 335 and it was not prejudicial to defendant." Id. The California Supreme Court summarily denied Petitioner's petition for review.

In the instant federal petition, however, Petitioner's claim is that the trial court failed to properly instruct the jury to consider that the accomplice signed a plea deal and to treat the accomplice's testimony with caution. This instructional error claim was not raised on direct appeal, and thus, implicates exhaustion concerns. However, pursuant to 28 U.S.C. § 2254(b)(2), the Court may deny an unexhausted claim on the merits "when it is perfectly clear that the [petitioner] does not raise even a colorable federal claim." Cassett, 406 F.3d at 624.

In the instant case, the jury was instructed with respect to witness credibility:

> In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony. Among the factors that you may consider are:
>
> . . .
>
> Was the witness promised immunity or leniency in exchange for his or her testimony?

(CT 108; 6 RT 609–10). Contrary to Petitioner's claim, the jury was instructed to consider whether a witness was promised leniency in exchange for testimony when evaluating a witness's

testimony. As it is "perfectly clear" that Petitioner does not raise a colorable instructional error claim, the Court may deny this claim on the merits pursuant to 28 U.S.C. § 2254(b)(2).

## V.

## RECOMMENDATION

Accordingly, the Court HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within **THIRTY (30) days** after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned District Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **June 21, 2017**

UNITED STATES MAGISTRATE JUDGE